IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN G. ARGIROPOULOS, :
on his own behalf and on behalf of Club :
10, Inc. :
:
v. :
: Civil Action No. CCB-06-0769
GEORGE KOPP, et al. :
:

...o0o...

**MEMORANDUM**

Plaintiff John Argiropoulos claims damages on his own behalf, and on behalf of Club 10, Inc. ("Club 10") in this action filed against defendants George and Jennifer Kopp, Joshua Katz, Aleksey Kofman, Francine and Larry Bledsoe, and Club 10. Specifically, Argiropoulos claims that the defendants breached contracts, made fraudulent representations, breached the duty of loyalty owed to Club 10's shareholders, and were grossly negligent in the management of Club 10. Katz and Club 10 counterclaimed against Argiropoulos for breach of fiduciary duty. Now pending are defendants' motions to dismiss Counts Seven through Twenty. The parties have fully briefed the motion and no hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, I will grant the defendants' motions to dismiss Counts Seven through Twenty.

**BACKGROUND**

Club 10 was incorporated in 2002 in the state of Maryland. (Second Am. Compl. at ¶ 17.) In the spring of 2005, Argiropoulos learned from a friend that George Kopp, the president and chief operating officer of Club 10, was seeking investors for Club 10 in the hopes that Club

1

10 would open a night club. (*Id.* at ¶¶ 20-21.) In their discussions about Argiropoulos's possible investment, Argiropoulos claims that Kopp emphasized that the corporation was run more as a family business than a regular corporation and that, as an investor, Argiropoulos could be expected to be included in all major decisions and be provided full access to information about the corporation. (*Id.* at ¶ 23.) Kopp told Argiropoulos that Kopp and the other board members ran Club 10 as a legitimate business that followed all applicable laws. (*Id.* at ¶ 24.)

After discussing his possible investment with Kopp, Argiropoulos met with Larry and Francine Bledsoe, who are shareholders of Club 10, and the parents of Jennifer Kopp. The Bledsoes also told Argiropoulos that Club 10 was run like a family business and not a regular business and that Argiropoulos could be expected to be treated as more of a partner than a regular shareholder. (*Id.* at ¶ 33.) The Bledsoes further told Argiropoulos that they had other business ventures with Kopp, and that he was honest and ran lawful businesses. Argiropoulos claims that the Bledsoes made these representations for the purpose of inducing him to join the Club 10 venture, although they knew at the time that Kopp did not act honestly in his other businesses and did not intend to run Club 10 in a legal manner. (*Id.* at ¶¶ 36, 39-41.) In June 2005, after his conversation with the Bledsoes, Argiropoulos purchased 6,000 shares of stock, equivalent to a twelve percent interest in defendant Club 10, for the sum of $240,000. (*Id.* at ¶ 44.)[1]

After Argiropoulos's purchase of the 6,000 shares, he claims that Kopp asked him if he

---

[1] As of June 2005, the stockholders in Club 10 held the following number and percent of shares: George and Jennifer Kopp (17,750 shares - 35.5%), Aleksey Kofman (8,500 shares - 17%), Francine and Larry Bledsoe (6,000 shares - 12%), John Argiropoulos (6,000 shares - 12%), Joshua Katz (4,500 shares - 9%), Evgeni Roshko (4,000 shares - 8%), Lee and Elena Caplan (3,250 shares - 6.5%). (Second Am. Compl. at ¶ 45.)

2

would make an additional equity investment of $60,000.  While Argiropoulos declined to make an additional investment, Argiropoulos agreed to loan Club 10 $60,000 without interest.  (Pl.'s Mot. for Temporary Restraining Order at Ex. 1F.)  The terms of the loan dictated that Club 10 would pay Argiropoulos the $60,000 in twenty-four monthly equal installments of $2,500 each, commencing September 1, 2005.  (*Id.*)  In August 2005, Kopp asked Argiropoulos to make an additional loan to Club 10 of $20,000.  Argiropoulos agreed to advance that sum to the defendant with the agreement being that the $20,000 would be added to the principal of the previous $60,000 loan.  (Second Am. Compl. at ¶ ¶ 52-54.)  The new terms of the loan dictated that Club 10 would pay Argiropoulos $3,334.00 monthly for twenty-four months beginning September 1, 2005.

In October 2005, Club 10 opened Club X Ultra Lounge ("Club X") for operation in downtown Baltimore.  Argiropoulos claims that he visited Club X several times in 2006.  Each time Argiropoulos visited, he asserts that George Kopp was in charge of the operations at Club X.  (*Id.* at ¶ 62.)  Despite the representations of Kopp and the Bledsoes prior to Argiropoulos's investment, Argiropoulos claims that he was given no opportunity to be involved in the major decisions of the running of Club X.  Instead, George Kopp was fully in charge of the operation at Club X, and all other board members deferred to Kopp at all times.  (*Id.* at ¶ ¶ 63-64.)

After the opening of Club X, George Kopp introduced Argiropoulos to Kopp's sister, Elena Caplan, and her husband Lee David Caplan, who are both shareholders of Club 10.  (*Id.* at ¶ 65.)  Lee David Caplan was primarily in charge of keeping the financial records of Club 10, and Caplan and the Kopps informed Argiropoulos that Club 10 was keeping two sets of financial books for Club 10.  (*Id.* at ¶ 68.)  Caplan and the Kopps told Argiropoulos that one set of books

was for "tax purposes" and did not include substantial parts of Club 10's sales and receipts. Argiropoulos was additionally told that most, if not all, of Club 10's employees were paid in cash and did not have taxes withheld. (*Id.* at ¶ 70.) Around this time, Argiropoulos was also introduced to Joshua Katz, a shareholder and employee of Club 10, who also reported that he was being paid in cash with no taxes withheld.

Argiropoulos reports that George Kopp approached him in December 2005 to discuss the purchase for $150,000 of a note Club 10 had made to a third-party in the principal amount of $200,000. (*Id.* at ¶ 73.) Kopp told Argiropoulos that he needed $75,000 to make the transaction happen and asked Argiropoulos if he would consider loaning him that amount of money. Argiropoulos refused to loan Kopp the money, at which point Kopp told Argiropoulos that he no longer wanted to discuss the matter with him. A week later, Kopp told Argiropoulos that he bought the note for $150,000; Argiropoulos alleges that the $150,000 came from the cash receipts of Club 10, though that purchase was not recorded on its books. (*Id.* at ¶¶ 76-77.) A few days later, Argiropoulos claims that Kopp told him that he purchased a new car for his wife for $40,000 in cash, which Argiropoulos again believes came from the cash receipts of Club 10.[2]

Argiropoulos claims that Kopp and Katz engaged in several questionable or illegal activities on the premises of Club X. For instance, Lee David Caplan told Argiropoulos that Kopp entered into arrangements with patrons to use facilities at Club 10 and have Kopp paid directly in cash. (*Id.* at ¶ 83.) Argiropoulos claims to have seen Kopp carry a handgun on the Club X premises, "water down" expensive liquors and wines, allow gambling on Club X

---

[2] Argiropoulos came to his conclusion that Kopp was wrongfully taking money from Club 10, in part, because Kopp had no employment outside of his activities with Club 10. (*Id.* at ¶ 81.)

premises, and serve alcohol to minors. (*Id.* at ¶¶ 84-85, 96, 97.) Argiropoulos also claims that Kopp provided illegal drugs to customers, procured prostitutes for customers and employees of Club X on its premises, and allowed "thugs, gangsters, drug dealers, gamblers, and low-life characters of all types" to frequent Club X. (*Id.* at ¶¶ 90-91, 93-94, 104.) Argiropoulos further claims that Katz routinely demanded sexual favors from women seeking employment at Club X, and on one occasion threw a woman out of Club X because she refused to engage in sexual relations with a customer. (*Id.* at ¶¶ 88-89.) Lastly, Argiropoulos claims that Club X discriminated against African-Americans on a systematic basis by charging them more for alcohol. (*Id.* at ¶ 102.)

According to Argiropoulos, beginning in January 2006, he tried to persuade Kopp to have Club 10 comply with all applicable laws and regulations, but Kopp refused to do so. (*Id.* at ¶ 117.) Unable to persuade Kopp, Argiropoulos began speaking with other shareholders of Club 10, including Jennifer Kopp, the Caplans, and Francine and Larry Bledsoe. Argiropoulos alleges that each of the shareholders with whom he spoke stated that they wanted Club 10 to be operated in a lawful manner, but were worried that "George Kopp would physically injure them" if they attempted to persuade Kopp to change course. (*Id.* at ¶ 120.)

Despite their fears, the shareholders agreed to meet with Argiropoulos on January 11.[3] At that meeting, Argiropoulos urged those shareholders to try to bring Club 10 into compliance with all laws and regulations. The shareholders agreed to attempt to persuade George Kopp to run Club 10 legitimately, and also agreed to oust Kopp from any role in the operations of Club

---

[3] Jennifer Kopp, Lee David and Elena Caplan, and Francine and Larry Bledsoe attended the meeting. (*Id.* at ¶ 123.)

10 if Kopp did not change course. (*Id.* at ¶ 125.)  During the discussions, the shareholders invited Kopp and Katz to join the meeting, which they did.  Kopp acted in a hostile manner from the beginning of the meeting and allegedly made several false statements about Argiropoulos, including that he had raped a woman employed by Club 10.  (*Id.* at ¶ 128.)  Argiropoulos claims he told Kopp Club 10 must be run in a lawful manner and detailed all of the activities he thought were illegal.  Kopp and Katz admitted that employees (including Katz) were being paid in cash, and that Kopp "had used cash from the operations of defendant [Club 10] to pay off notes owed to him" by Club 10 even though that transaction was not recorded in Club 10's records and other payables owed by Club 10 were going unpaid.  (*Id.* at ¶ 133.)  At the end of the meeting, Kopp agreed to bring Club 10's operations in accordance with all applicable laws.

Notwithstanding Kopp's assertions at the meeting, Argiropoulos alleges that Kopp did not implement any changes in Club 10's operations.  In response, Argiropoulos spoke with other shareholders and attempted to buy enough shares in Club 10 to gain majority control of the corporation.  When Kopp learned of Argiropoulos's attempts to gain control of Club 10, on January 28, 2006, Kopp confronted and threatened to kill Argiropoulos if Argiropoulos continued to attempt to buy more shares in Club 10.  (*Id*. at ¶ 138.)  After threatening Argiropoulos, Kopp offered to buy his shares in Club 10 for the price that Argiropoulos paid (i.e. $240,000), and pay back the money loaned (i.e. $80,000) to Argiropoulos by February 1, 2006.  (*Id*. at ¶ 143-44.)  In return for this promise, Argiropoulos agreed not to foreclose on the promissory note and not to seek to buy any further shares in Club 10.  The two shook hands on the deal.  (*Id.* at ¶ 146.)

Subsequent to the January 28 meeting, Argiropoulos has not been included in any of Club

10's board meetings. While Club 10 hired a manager for the operations of Club 10, Argiropoulos alleges that the illegal activity continued. Argiropoulos continued to press the directors of Club 10 to remove Kopp from any role in Club 10's operations and to get it to come into line with applicable laws and regulations, but his efforts were met with no success. (*Id.* at ¶¶ 158-59.) Argiropoulos claims that the Caplans and Evgeni Roshko did attempt to change Club 10's operations, but that the other shareholders did not. (*Id.* at ¶¶ 160-61.) Specifically, Argiropoulos alleges that the Bledsoes "acquiesced in and approved the continuing criminal and illegal conduct of [Kopp and Katz]" by not successfully persuading Kopp and Katz from changing course. (*Id.* at ¶ 167.) In June 2006, Kopp and the other shareholders shut down the operations of Club 10 and permitted Club 10 to default on its financial obligations.

Argiropoulos alleges that Kopp and Club 10 accumulated large amounts of debt, in part because Kopp was taking cash from the corporation for personal business.[4] The monies illegitimately taken from Club 10 include checks Jennifer Kopp wrote drawn on Club 10 totaling $35,000. (*Id.* at ¶ 112.) Argiropoulos asserts that because Club 10 was not properly paying its taxes, it will be responsible for paying substantial back taxes and penalties. Argiropoulos was only paid back $6,668 of the original $80,000 lent by him. (*Id.* at ¶ 184.) Argiropoulos further claims that he has not had his shares in Club 10 bought back by Kopp.

In March 2006, Argiropoulos filed a complaint with this court, which was amended in

---

[4] Argiropoulos alleges that at the time of the filing of the second amended complaint, Club 10 had the following debts: (1) a $110,000 note for installation of kitchen equipment, (2) a $250,000 note for start-up costs, (3) a second $250,000 note for start up costs, (4) a $7,000 note for elevator installation, (5) $52,000 note for HVAC, (6) $15,000 note for sound and light equipment, (7) $120,000 in back rent, (8) $12,500 for computer software, and (9) $73,332 owed to Argiropoulos under the promissory note. (*Id.* at ¶ 110.)

May 2006 and again in September 2006 against Club 10, George and Jennifer Kopp, Joshua Katz, Aleksey Kofman, and Francine and Larry Bledsoe. In his second amended complaint, Argiropoulos alleges that Club 10 has defaulted on the $80,000 loan he made (Counts One through Three). Argiropoulos alleges that George Kopp and Club 10 further breached the contract to repurchase Argiropoulos's 6,000 shares for $240,000 (Count Four.) Argiropoulos also claims that George Kopp, Francine Bledsoe, and Larry Bledsoe fraudulently or negligently misrepresented material facts in order to induce Argiropoulos to invest in Club 10 (Counts Five and Six).

In addition to the individual claims listed above, Argiropoulos sued George Kopp, Jennifer Kopp, Katz, Kofman, and the Bledsoes in their capacity as directors of Club 10 for harming its stockholders. Specifically, Argiropoulos sued the individual directors for breach of the duty of loyalty for mismanaging Club 10 (Count Seven), waste (Count Eight), gross negligence (Count Nine), fraud (Count Ten), conversion (Count Eleven), theft (Count Twelve), and unjust enrichment (Count Thirteen). For each of the counts, Argiropoulos alleges, *inter alia*, the defendants took cash from the corporation for illegitimate expenses, violated tax laws, served liquor to minors, allowed the sale of illegal drugs on the premises, created false financial records, and discriminated against customers. Argiropoulos also sued the individual defendants derivatively on behalf of Club 10, realleging breach of the duty of loyalty (Count Fourteen), waste (Count Fifteen), gross negligence (Count Sixteen), fraud (Count Seventeen), conversion (Count Eighteen), theft (Count Nineteen), and unjust enrichment (Count Twenty). The Bledsoes moved to dismiss Counts Seven through Twenty of the Second Amended Complaint. The Bledsoes' argument was incorporated by reference in motions to dismiss filed by the Kopps and

by Katz.[5]

## ARGUMENT

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks and alterations omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Consequently, a motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Edwards*, 178 F.3d at 244. To survive a motion to dismiss, however, a complaint must "in light of the nature of the action . . . sufficiently allege each element of the cause of action so as to inform the opposing party of the claim and its general basis." *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 348 (4th Cir. 2005). In addition, because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal conclusions. *See*, *e.g.*, *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) (noting that the "presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions).

### Counts Seven through Thirteen

---

[5] Kofman, who is not represented by counsel, did not file a motion to dismiss, but the analysis contained in this memorandum applies to Kofman as well.

Defendants argue that a suit to recover damages to a corporation can only be brought by the corporation itself through a derivative action, and not by individual shareholders. This general rule is well established in Maryland law, and its justification is explained by the leading case on the topic:

> The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only though the corporation. The rule is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each.

*Waller v. Waller*, 187 Md. 185, 49 A.2d 449, 452 (1946); *see also O'Donnell v. Sardegna*, 336 Md. 18, 646 A.2d 398, 403 (1994); *Tafflin v. Levitt*, 92 Md. App. 375, 608 A.2d 817, 820 (Md. 1992). Where a shareholder alleges an injury that is distinct from the corporation, however, the individual shareholder has standing to redress that injury. *See Strougo v. Bassini*, 282 F.3d 162, 171 (2d Cir. 2002) (applying Maryland law); *Tafflin*, 608 A.2d at 820. "Where shareholders suffer an injury that does not stem from an injury to the corporation's business or property, by contrast, the corporation lacks standing to sue, and Maryland's "distinct injury" rule allows shareholders access to the courts to seek compensation directly." *Strougo*, 282 F.3d at 171.

Argiropoulos contends that Maryland law allows individuals to sue for alleged breaches of fiduciary duty by directors. *See Strougo*, 282 F.3d at 172. While it is correct that breaches of fiduciary duty are actionable, it remains incumbent upon the individual to allege a distinct injury separate from the corporation's. *Id.* at 174-76. The Maryland courts have held that various causes of action redressable by the corporation and not by an individual shareholder include:

mismanagement of corporate funds and waste, *see O'Donnell v. Sardegna*, 336 Md. 18, 24-25, 646 A.2d 398 (1994); mismanagement and misappropriation of corporate funds, notwithstanding allegations of fraudulent representations, *see Tafflin*, 608 A.2d at 820; and mismanagement of corporate stock resulting in plaintiff's losing a controlling interest in the corporation, *Danielewicz v. Arnold*, 137 Md. App. 601, 621, 769 A.2d 274 (Md. 2001).  In contrast, in *Delmarva Sash & Door Co. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 734 (D. Md. 2002), this court found that where, for practical purposes, a corporation prevented individual shareholders from selling their shares, the plaintiffs had asserted a distinct injury that was suffered by them and not the corporation as a whole.

Here, counts Seven (Breach of Duty of Loyalty), Eight (Waste), Nine (Gross Negligence), Ten (Fraud), Eleven (Conversion), Twelve (Theft), and Thirteen (Unjust Enrichment) are all based on the same allegations: that the defendants engaged in waste, illegitimately took cash from the corporation, violated tax laws, permitted illegal activities on Club 10 premises, discriminated against customers, and generally mismanaged the corporation. (*See* Second Am. Compl. at ¶¶ 254, 268, 280, 292, 304, 316, 328.)  These allegations are classic descriptions of waste and mismanagement of the corporation, and under the precedent set forth in *Sardegna*, *Tafflin*, and *Danielewicz*, these allegations, if true, would be injuries to the corporation and not to any individual shareholder.  Indeed, Argiropoulos has made no attempt to explain why his injuries are distinct from the corporation's.  To the extent that Argiropoulos is claiming that the defendants lied to *him*, failed to repay *him*, or breached contracts with *him*, those allegations are covered in counts One through Six of the Second Amended Complaint. None of the allegations listed in counts Seven through Thirteen, however, are injuries to

11

Argiropoulos as a shareholder under Maryland law.  Argiropoulos's claims allege injuries to the corporation and would be typically appropriately brought under a derivative action.  Accordingly, counts Seven through Thirteen will be dismissed.

### Counts Fourteen through Twenty

In counts fourteen through twenty, Argiropoulos brings a series of claims on behalf of the corporation in the form of a shareholder derivative action.  Under Federal Rule of Civil Procedure 23.1, a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1.  The defendants argue that Argiropoulos cannot meet this standard because his personal claims against the corporation create a conflict of interest, making it impossible for him to fairly and adequately represent the interests of the shareholders.  In particular, the defendants argue that Argiropoulos is attempting to have his shares repurchased by the defendants (count 4) and collect on debts that the corporation allegedly owes him (counts 1 through 3).  The defendants contend that Argiropoulos's attempts to open a new nightclub on the same property where the Club X used to reside creates an additional conflict.

The Sixth Circuit has enumerated the factors typically considered when determining whether a derivative plaintiff meets Rule 23.1's representation requirements:

> "economic antagonisms between representative and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants; and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent."

*Davis v. Comed, Inc.*, 619 F.2d 588, 593-94 (6th Cir. 1980). Thus, while it is typically not an absolute bar to suit, *see, e.g., Mayer v. Development Corp. of America*, 396 F. Supp. 917, 931 (D. Del. 1975), a plaintiff's individual suit against the corporation, while maintaining a simultaneous derivative action, raises a serious question about whether the plaintiff can properly represent the interests of the shareholders. *See, e.g., Zarowitz v. BankAmerica Corp.*, 866 F.2d 1164, 1166 (9th Cir. 1989) (plaintiff could not serve as derivative plaintiff where his interest in increasing the value of his stock "through a larger derivative suit recovery is dwarfed by his interest in pursuing his litigation with the Bank"); *Owen v. Modern Diversified Ind., Inc.*, 643 F.2d 441, 443 (6th Cir. 1981) (plaintiff could not serve as derivative plaintiff where there was "a strong possibility that [the] derivative action would be used merely as a device to obtain leverage" in plaintiff's individual suit.) Where a derivative action and a plaintiff's individual monetary recovery are in competition for the same pool of money, it makes it further unlikely that plaintiff will be an appropriate derivative plaintiff. *See Horowitz v. Pownall*, 582 F. Supp. 665, 666 (D. Md. 1984) (finding conflict where "the proposed class and plaintiff would be in direct competition with each other for the damages that the directors and officers would be required to pay in compensation for their illegal actions.")

      Here, Argiropoulos is not an appropriate representative for the derivative plaintiffs for several reasons. Most importantly, Argiropoulos' second amended complaint alleges that in February 2006, Kopp promised to buy all of Argiropoulos's shares in Club 10 for the price he originally paid. (Second Am. Compl. at ¶ 144.) In Count Four of his complaint, Argiropoulos is suing to enforce that promise to have Kopp buy back his shares. If successful in this attempt, Argiropoulos will have no remaining shares in Club 10, and will have no remaining stake in the

corporation. At that point, he would no longer have standing to bring a derivative suit on behalf of the shareholders of Club 10 because he would no longer be a shareholder. *Lewis v. Anderson*, 477 A.2d 1040, 1047 (Del. 1984); *Heckmann v. Ahmanson*, 168 Cal.App.3d 119, 130, 214 Cal.Rptr. 177 (1985) ("Once a derivative plaintiff sells its stock, it no longer has standing to prosecute the derivative claims on behalf of the remaining shareholders."). This conflict between a plaintiff's individual claims and the derivative claims is impermissible under Rule 23.1. Where a party's standing to bring a derivative lawsuit would be extinguished by the success of his individual claims, that party should not be permitted to maintain both suits. While Argiropoulos argues that the other derivative plaintiffs know about the conflict and nevertheless want the claims to go forward, the named derivative plaintiff must always have standing to pursue suit.

Other factors also weigh against allowing Argiropoulos to pursue the derivative claims. Given that Club 10 is now defunct, it has a finite amount of money that it will be able to use to pay its creditors. Argiropoulos's individual claims assert that the corporation owes him significant amounts of money. Because the derivative claims also seek to obtain money damages for the shareholders, Argiropoulos and the derivative class are competing for the same pool of money, which, under Maryland law, could create a conflict. *See Pownall*, 82 F. Supp. at 666. Put another way, the plaintiff is not similarly situated to the rest of the derivative plaintiffs, because the other plaintiffs are not pursuing their own individual lawsuits alleging that the corporation owes them debts. To the extent there is a limited pool of money that the now-defunct Club 10 will be able to use to pay off creditors, Argiropoulos has every incentive to try to have his individual claims paid before the derivative claims are paid because Argiropoulos is

the sole beneficiary of his individual claims.  Accordingly, while not judging the derivative claims on their merits, I nevertheless will dismiss counts Fourteen through Twenty on the grounds that Argiropoulos is not an adequate representative of the derivative class.

    A separate order follows.

| | |
|---|---|
|  March 26, 2007  <br> Date |     /s/     <br> Catherine C. Blake <br> United States District Judge |